THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHESTER LESTER, Defendant-Appellant.

Second District No. 2—85—0413

Opinion filed July 7, 1986.—Modified on denial of rehearing August 19, 1986.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Kenneth R. Boyle, of State's Attorneys Appellate Prosecutor, of Springfield, and William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Chester Lester, was charged by indictment in the circuit court of Kane County with three counts of murder pursuant to section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 9-1(a)(1), 9—1(a)(2)) following the September 29, 1984, death of four-year-old Jared Powell, the son of a woman with whom Lester lived. The defendant was found guilty of murder by a jury and sentenced to 40 years in the Department of Corrections. He contends evidentiary errors deprived him of a fair trial, he was not found guilty beyond a reasonable doubt, and he was denied his right to a jury representing a fair cross-section of the community when the prosecutor was allowed a peremptory challenge to a black venireman.

During *voir dire*, the prosecution exercised a peremptory challenge to exclude venireman Andrew Harris, a black man. In response

to a defense objection, the prosecutor stated that "contacts" indicated Mr. Harris had prior arrests which were not divulged during the latter's questioning. Arguing that the "contact cards" utilized in juror selection did not provide any specific identification information, the defense attorney disputed the accuracy of the prosecutor's claim. The court overruled the objection and allowed the peremptory challenge to stand.

Jared Powell had been a student in Janice Head's afternoon kindergarten class in an Aurora elementary school for nine days commencing on September 18, 1984. He was absent from class for two of the nine days. Head recalled that he was in class on Thursday and Friday, September 27 and 28. She took his picture on Thursday for use at an upcoming open house for parents. She did not observe any extraordinary bruises on Jared's body, and she did not see any cuts on him on Friday, September 28.

On Saturday the 29th, Erlene Smith held a birthday party for her five-year-old son Cory at a McDonald's restaurant on Lake Street in Aurora. About 28 children attended the party, along with six or seven adults. The party began at 4 p.m. Smith recalled that about half of the children at the party, as well as other children, played outside on the restaurant's play equipment. She remained inside throughout the party.

Smith recalled seeing Jared Powell at the party with a lady she thought to be his mother. She said there was nothing unusual in the way he played. She did not watch Jared throughout the party. On direct examination, she said she noticed that Jared's hands were red. On cross-examination, she said she did not remember that Jared had any bruises at the time of the party, and that when the police mentioned the bruises to her when they spoke with her in early October, she told Aurora police investigator Karen Krass that she did not recall seeing any bruises. Smith testified that almost anything could have happened at the party and she may not have seen it. She noticed Jared's hands were red when his mother gave him some money and he reached out for it.

Smith recalled that some of the children stayed at the party until 7 p.m. When she first saw Jared at the party he came up to her and asked her where her son was, and she told him he was out on the playground. She did not see Jared leave. She said that none of the children complained about an accident. Over a defense hearsay objection she was allowed to testify that none of the adults talked to her about an accident on the playground. The six or seven adults who were at the party were there with their children; they were not there

to help her. Only about two of the adults stayed.

Mary Schenk and her daughter, Carla Tackett, lived in a first-floor apartment at 811 Huntington Drive, Aurora, just beneath the apartment of Lester, Mary Jane Powell and Powell's two children, four-year-old Jared and Jamison, an infant. Tackett testified that she never saw Lester strike Jared. On the night of September 29, Schenk and Tackett were watching television in their living room when, at about 8:20 or 8:30 p.m., they both heard a noise from the upstairs apartment, sounding "like someone had dropped a bottle of milk or something on the floor." It was sufficiently loud that they both jumped up. A few seconds later, they heard the sound of something hitting the wall. Tackett recalled telling the police that it sounded like the kids were playing on their small trampoline upstairs; the noise she heard was like "clumps." After the second noise, Tackett got up, turned off the television, opened the window and opened the door to the hallway to hear if there were any sounds of crying. They heard no noise, and heard no other noises for the next two hours. The two women stayed inside their apartment, and Tackett subsequently retired about 10 p.m.

About 10:30 p.m. Schenk, who was watching the news, heard a pounding on her door. Looking through the peephole, she saw Lester, who was telling her to open the door because "[his] baby [was] sick." She opened the door and noticed that Lester was wearing only a pair of pajama bottoms, as was Jared. She said that Jared, who was being held by Lester, was not moving. Lester told Schenk that Jared had been at a party at McDonald's. He said repeatedly: "My baby is sick. My baby is sick." Schenk called for her daughter, and then got a blanket and wrapped it around Jared. She noticed the boy's eyes were open and cloudy; she did not see him breathing. Tackett was dressed within five minutes. She suggested calling 911 for help, but Lester insisted that they take Jared to the hospital themselves. Schenk saw Lester later that evening in the company of a police officer. Lester and the officer went upstairs and when they came down again, Lester tapped on her window, smiled, waved and said "Hello, Ma."

Before driving to the hospital, Tackett went with Lester and Jared to their upstairs apartment so that Lester could put on a shirt and pants and get Jamison. She said Jared never moved or made any sound. While upstairs, Tackett saw nothing out of the ordinary about the apartment. She did not remember everything the defendant said during the drive to Mercy Center Hospital. She did remember him mentioning food poisoning at McDonald's.

Later at the hospital, Lester telephoned Mary Jane Powell at her

place of employment. Tackett said that he was too excited to speak understandably, so she was given the phone and she talked to Powell. Powell later arrived at the hospital, and after coming out of the emergency-room treatment area, appeared to Tackett to be "totally exhausted" and in shock.

Ellen Felix, an emergency-room nurse at Mercy Center, said a man came into the hospital carrying a child about 10:45 p.m. The child was not moving and had vomitus coming from his mouth. She thought the boy was dead. Felix was unable to identify the man in court; she recalled that his name was Chester Lester and that the boy's name was Jared Powell. Felix asked Lester what happened; she did not know if he said anything in response. She asked him who he was and Lester said he was the boy's father. She testified Lester hovered over the boy, asking "What's wrong with him[?] What's wrong with him[?] There's nothing wrong with him." After an emergency "code blue" was sounded, resuscitation was commenced. Felix described Lester as emotional and frantic. She yelled to her supervisor to call for pastoral care for Lester, whom she felt was "really losing it"; meaning that he was becoming hysterical, emotional, and frantic.

Felix characterized Jared as being "real dead"; he had absolutely no motion; his arms and legs were cold; he had "old vomitus that had been on him for awhile on his face"; he had a constant stare; no pulse and no carotid pulse; his pupils were fixed and dilated and there was a film over the portion of his eyes not covered by the eyelid. During the entire time he was being worked on in the emergency room, there was no response from the boy. After he was pronounced dead, the body was stripped of clothes and cleaned off. She observed that the body was covered with bruises; forehead, neck, flank area, rib area, legs, and his right testicle was swollen and discolored. She testified that the boy's mother, Mary Jane Powell, came in about 11:30 p.m. to view the body. She and the defendant talked. The defendant put his arm around her, and she flung around with her elbow extended. She was very upset, and someone from the hospital's pastoral care took her out of the emergency room.

David Blanchard, an emergency-room physician on duty at Mercy Center, attended to Jared at about 10:50 p.m. He described Jared as being in a flaccid state; there was no breathing or spontaneous heart beat. Lester told him Jared had eaten at a local restaurant and may have fallen and injured himself and stopped breathing and was rushed to the emergency room for treatment. Blanchard began cardiac resuscitation. After working on Jared for 15 or 20 minutes, he pronounced Jared dead. Blanchard never saw any signs of life from the child.

Blanchard testified that he observed "massive bruising" on Jared's body. He noted bruises on the chest, abdomen, back, buttocks, thighs, front and back of both legs, arms and face. He estimated, based on his experience, that the bruises would range in age from about 8 to 14 hours old. On redirect examination, Blanchard testified it was possible some of the bruises were fresher than eight hours old The child's scrotum was "ecchymotic"—blackened as if full of blood— and the testicles were swollen. There was a healed burn on the right hand. He observed what appeared to be a moderately deep 2- or 3-inch laceration on the back of the scalp which would have required stitches to close, and which appeared to be just a few hours old. Jared's stomach was swollen and distended, indicating the presence of "a considerable amount of blood" in the stomach. His opinion was that the most common cause of the bleeding could have been a blunt abdominal injury, a ruptured spleen or laceration of the liver due to blunt trauma. X rays indicated a couple of old rib fractures and an old, healed clavicle fracture. Blanchard's initial assessment was that Jared had been beaten to death. Blanchard explained that the bruises on the upper extremities, hands and thighs likely did not contribute to Jared's death. He also testified that the burn on the hand had been treated by Mercy Center on an earlier date.

Blanchard testified that when he first told Lester it looked like Jared had been beaten, Lester quickly denied responsibility. When Blanchard talked with him a second time, Lester mentioned disciplining Jared earlier that day on the buttocks; he denied beating the child. Lester put Jamison Powell, whom he had been holding, on a table, and asked Blanchard if he saw any bruises on him. Blanchard did not examine the baby.

Aurora police officer Diane Carlson was called to Mercy Center at 11:30 p.m. After talking with Tackett and Doctor Blanchard, she drove Lester to the police station, stopping first at his apartment to get some shoes and socks and to change his shirt. Carlson later returned to the defendant's apartment after Mary Jane Powell consented to a search. Patrolman Charles Lawrence collected items and took photos for use as evidence. Also present during the search were Detective Krass and Investigator Stover. Carlson observed a trampoline folded up between a couch and a wall in the front room. Patrolman Lawrence described Jared's bedroom as being "rather neat"; the bed was made and clean, although there was no pillow on it. There was a pillow in a "Charlie Brown and Snoopy" pillowcase on the bed in the master bedroom. Lawrence noticed possible blood stains on the item. A yellow sheet with Disney animals and possible vomitus stains

on it was taken from the clothes hamper. Blue-checked top and bottom sheets taken from the master bedroom also had possible vomitus and blood stains on them. A piece of drywall with possible blood on it was removed from the hallway. A pair of men's blue pajama bottoms with stains on them were collected from the wash basket. Two pieces of tile from the floor in front of apartment A, directly below the defendant's apartment E, were taken. One had possible blood and vomitus stains on it. A piece of drywall with a stain on it was taken from the ceiling of the child's bedroom.

Karen Krass, an investigator with the Aurora police department, went to Mercy Center on the night in question and learned that Mary Jane Powell was the natural mother of Jared and Jamison Powell. Lester was Mrs. Powell's boyfriend and also the father of Jamison.

Krass first interrogated Lester at 7:30 a.m. on September 30 in a room at the Aurora police department, along with another police officer. She said Lester appeared to be in good condition, alert, rational, and seemed to understand the *Miranda* warnings. He told Krass that Mary Jane Powell took Jared to the party at McDonald's, then returned home and picked up Jamison and Lester and returned to the party sometime after 5 p.m. The party was running late, so Lester and Jamison stayed at the party while Mary Jane went to work. Lester recalled that Jared ate a cheeseburger, french fries and a piece of cake. He also told Krass that Jared "apparently had come down the slide and collided with one of the boys." She believed the defendant said it was Jared who told him about the slide collision. Jared then told Lester he was not feeling well, but said he felt well enough to walk home and the three left at 6:40 p.m.

Along the 1.3-mile walk home from McDonald's, they picked up aluminum cans, and stopped at a package liquor store where Lester bought a 32-ounce can of beer. They also stopped at another store for some candy. When Jared again complained of feeling badly, Lester carried him for awhile. It took about an hour to get home.

Once home, Jared wanted to play outside. Lester refused and told him to watch television. Lester gave Jared some Kool-Aid to drink. Jared again complained about not feeling well; Lester explained to Krass that he wanted to wait until Mary Jane came home; it was Mary Jane who took Jared to the doctor for his checkups. Lester then gave Jared a shower, and the two of them watched television on Lester's bed.

At some point, Jared began to vomit on the bed and on Lester. When Jared began to gasp for breath, Lester pushed on the boy's chest in an attempt to open an airway. Lester became worried about

Jared's condition so he picked him up and carried him to the apartment below. Lester said that Jared was conscious at the time and able to answer questions.

Lester told Krass he thought Jared died from food poisoning. He said the cut on Jared's head resulted from a fall in the bathtub a couple of days earlier. He said the cut did not bleed very much, and that he felt it did not need any medical attention. He did not think Jared had gotten any blood on any clothing or furniture in the apartment. Lester explained the bruises on Jared's forehead came from the slide collision at the party; the bruises on his side, Lester thought, came from swings at the apartment-complex playground. Krass said Lester could not account for all of the bruises which appeared on Jared's body. Krass said she saw the cut on Jared's forehead; it was about 1 to 1½ inches long. The skin had separated about one-quarter inch. It was red and looked as if it needed stitches. Lester denied hitting Jared, explaining that he only spanked him once, sometime ago in Milwaukee when Jared was being potty trained. Over objection, Krass said the defendant admitted being an amateur boxer for a number of years but had quit a few years ago. He said he taught Jared some self-defense, but never punched him. He said that Mary Jane only spanked Jared once, "a long time ago." Later, the defendant said that he had not disciplined Jared much in the past; Mary Jane was in charge of discipline.

Krass next spoke with Lester at 8:15 the next morning, again at the Aurora police department. During this interrogation he was advised that he had been charged with the offense of murder. Lester substantially repeated the same explanation he had offered on the 30th. He said there was a "problem" at home but did not know what it was. He explained that he and Mary Jane spanked Jared when he defecated in his pants or lied, and that he once used a belt to spank him after Jared went to the bathroom in his pants and then lied about it. The last spanking occurred during the previous month. When Krass told Lester that X rays showed that Jared had broken bones, Lester told her she was lying.

That same morning, Krass, another detective and an assistant State's Attorney interrogated Lester for a third time. Krass said the defendant did not display any emotion during the interrogation. He again said he never struck Jared. Lester recalled that on the previous Thursday, he fixed some hot dogs for Jared. Jared got sick and vomited and Lester told Jared to take a shower. While Jared was in the shower, Lester heard a bump; Jared had fallen, hitting his head on the soap tray. Lester treated the wound with alcohol and cotton.

Lester said that he had hot dogs earlier in the day and that he, too, got sick from them. On Friday Jared felt fine, ate normally and played in the apartment complex playground. He went to school on Friday with Mary Jane at noon and returned home at 2:30. He later ate dinner and went to bed, feeling fine. At 7:25 Saturday morning, Lester woke him to watch TV cartoons and Jared ate several cinnamon rolls. He appeared to be fine. Later, at the party, Jared complained of feeling poorly, with a stomachache, before eating. Lester said that Jared played quietly that night and there were no loud noises coming from his apartment. Defendant displayed no emotion during the interview. He was asked multiple times during the three interviews if he had beaten and killed Jared, and he denied it.

Jennie Hahn, a forensic scientist, testified regarding the various items of evidence that had been collected. Human-blood stains found on a pillow and pillowcase were not those of the defendant and, although they could have been Jared's, it was not conclusively determined that they were.

Larry Blum, a pathologist, performed an autopsy of Jared Powell on September 30. In addition to the autopsy, Blum received a verbal report as to the coroner's findings, and reviewed a report from Doctor Fitzpatrick, a radiologist who reviewed the X rays taken of Jared's body, emergency-room records, and two toxicology reports from the Department of Public Health.

From his external examination, Doctor Blum's opinion was that Jared had incurred blunt-force injury, as opposed to a gunshot or knifing injury, etc. Such blunt force can be caused by contact with a floor, wall, car, fist or other blunt object. He thought that an abrasion along one leg was three or four days old. The head laceration, which was about a quarter of an inch wide, was caused by a moderate degree of force; no skull fracture had occurred. The fact that death had occurred some 12 hours before the examination, Dr. Blum said, could tend to increase the size of the bruises. Some bruises, he said, normally take one or two days to develop. All of the bruises on Jared's body were of a similar color. His opinion was that the wounds were consistent with Jared being struck. There was no indication that a blunt instrument was used. The bruises on the hips could have been caused by a fall to the ground. Marks on the hands appeared to be thermal immersion-type burns.

Doctor Blum's internal examination disclosed an abnormal amount of free blood in the abdominal cavity, a small amount of hemorrhaging in the chest cavity, a bruise on the right lung, and internal laceration of the spleen, hemorrhaging of the pancreas, right adrenal gland, and

on the exterior of the right kidney. The liver had incurred a laceration, had ruptured, and was the cause of the free blood found in the abdominal cavity. Also bruised, apparently due to blunt trauma, were the colon, diaphragm, stomach, small bowel, and pancreas. The liver sustained the greatest injury. The stomach was empty and was not distended during his examination. Blunt trauma to the stomach, if it had content, he said, could cause vomiting. Bad or improperly prepared food could also induce vomiting.

Blum testified that with the internal injury to the liver, life could go on for a period of time until the blood loss produced shock. Sleepiness is characteristic of shock. When bleeding becomes brisk, the blood empties into spaces like the abdominal cavity and death comes rapidly. In Blum's opinion, Jared died within 20 to 120 minutes after the liver injury. Approximately one-half of Jared's blood volume had been lost internally as a result of his injuries. The cause of death, Doctor Blum testified, was hemorrhagic shock due to multiple blunt trauma.

Doctor Blum also was of the opinion that the amount of force necessary to cause the internal injuries ranged from "moderate" (injury to kidney, adrenal gland, stomach, intestine, pubic area, and lung) to "a great deal" (liver, spleen). He later acknowledged that his opinion regarding the "moderate force" necessary to produce some of the injuries was measured on a subjective scale which was based on his experience. The injuries were consistent, he said, with a sharp blow from a fist. Over objection, he said the injuries were "nonaccidental" in nature and not consistent with a collision with another child on a slide. Also over objection, he testified the type of immersion scarring on Jared's hands was of a "nonaccidental nature."

Over continuing objection, Blum testified that the report of Doctor Fitzpatrick, a diagnostic radiologist who read the X rays taken of Jared's body, indicated a number of rib fractures which were 28 days old, a rib fracture older than 28 days, a collar-bone fracture older than one to two weeks, and an undated fracture to the upper right leg.

On cross-examination, Doctor Blum indicated that he found no brain or internal head injuries. The blunt trauma inflicted came from many directions: from the lateral side on the right, straight on into the abdomen; to the left side and to the back. Frequently, he said, there are injuries to the spleen when the overlying ribs are fractured, but that he observed no fresh rib fractures. Blum admitted that in researching lengths of time that have elapsed before death in cases involving similar liver damage, the longest period of time he found was

24 hours. He admitted having previously testified at the coroner's inquest that the laceration on Jared's scalp was one to two days old, but he performed additional studies since that time. In Blum's opinion, a child could walk or run initially after receiving similar injuries but would experience pain and would have been prevented from normal play by the pain. He allowed that it would be impossible to be exact as to how fast Jared's bleeding occurred. The fact there were reports about the prior medical treatment received by Jared indicates only that a physician saw and treated Jared about the time the burns on his hands occurred.

On redirect examination, Doctor Blum stated his opinion that if there had been no damage to the liver yet the rest of internal injuries had gone without medical attention, death would still have resulted. Blum was also of the opinion that Jared could not have walked over a mile with his injuries, and that he did not die of food poisoning. Compared with an adult, children are more susceptible to the effects of blood loss and the resultant shock.

On March 28, 1985, the jury returned its verdict finding the defendant guilty of the offense of murder.

■■ ■ Defendant's first contention is that he was deprived of a fair trial by reason of three instances of evidentiary error. The first error he alleges was when Erlene Smith testified over objection that none of the adults at the party talked with her about an accident on the playground at McDonald's. He argues the State's purpose in eliciting such testimony was to make the defendant's slide-collision explanation for Jared's injuries seem "foolish," and that the court's allowance of this testimony amounted to the improper admission of hearsay constituting reversal error.

The State asserts the issue is waived; alternatively, the testimony was not hearsay or was harmless error.

Although we find no similarity between the alleged hearsay at bar and that found in the cases cited by the defendant, *People v. Trotter* (1975), 27 Ill. App. 3d 136 (where officer testified to defendant's neighbor's out-of-court statement), and *People v. Kneller* (1980), 83 Ill. App. 3d 325 (where victim testified to defendant's mother's out-of-court telephone statement to him), we agree that the testimony was objectionable on the basis it was hearsay. (McCormick, Evidence sec. 247, at 586-87; sec. 250, at 600 (2d ed. 1972).) The witness purported to speak from her own knowledge that no one told her of the occurrence of an accident, yet clearly the testimony was offered as proof that no accident occurred, and it is plain that the witness would have had little reasonable opportunity to observe the

fact for herself since she was inside the entire time. The testimony offered showing the absence of complaints of an accident occurring served as the basis for an inference that no accident occurred, and none of the other adults at the party were called to testify. Nevertheless, the defendant's failure to include this issue in his written posttrial motion constitutes a waiver of the same, despite the fact an objection was interposed at trial. *People v. Howard* (1985), 139 Ill. App. 3d 755, 762.

■ Anticipating the waiver rule, defendant urges the issues be reviewed as plain error pursuant to Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)). It is well accepted "that [the plain error] exception is a limited one (*People v. Pickett* [(1973), 54 Ill. 2d 280]), 'not *** a general savings clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court' (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227, 231) and should be invoked only where the evidence is so closely balanced that it might be said that the jury's verdict may have resulted therefrom (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233) or the error is of such magnitude that fundamental fairness was denied (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331)." (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 396.) Not conceding the strength of the circumstantial evidence, defendant asserts the prosecution's reference to the hearsay during closing argument made its case against him "undeniably stronger" and the cause should be reversed because of this error. The hearsay evidence in *People v. Kneller* (1980), 83 Ill. App. 3d 325, cited in support by the defendant, did make the State's case there undeniably stronger where it involved testimony by the burglary victim that the defendant's mother told him that she had found his checkbook in her son's car. The hearsay evidence here did not substantially strengthen the State's case nor did it "eviscerate" the defense. (See *People v. Colon* (1974), 20 Ill. App. 3d 858.) Defendant's statement to the police showed he thought Jared died of food poisoning, and he attributed only the bruise on Jared's forehead to the alleged slide collision. The evidence at trial showed the bruise on Jared's forehead was not a factor contributing to his death. We conclude the admission of the hearsay testimony could not reasonably have affected the jury's verdict in light of the evidence as a whole, and that it did not constitute reversible error.

■ The second evidentiary error alleged is that the court allowed Aurora police department investigator Karen Krass to testify over objection that the defendant said that he had previously been an amateur boxer for a number of years. Defendant contends his amateur

boxing past was irrelevant and, as demonstrated by reference to that fact in the prosecutor's closing argument, was unduly prejudicial and should not have been admitted. Defendant contends the value of that evidence was only marginally probative, was outweighed by its potential for prejudice, and should be found to be reversible error as in *People v. Reimnitz* (1979), 72 Ill. App. 3d 761, and *People v. Malkiewicz* (1980), 86 Ill. App. 3d 417. The defendant's conviction for the murder of his wife in *Reimnitz* was reversed and remanded solely due to the improper admission of evidence that the defendant had been engaged in a homosexual act 7½ months after the offense in question. In *Malkiewicz*, the defendant's convictions for rape, deviate sexual assault and armed violence were reversed and remanded on the basis of the prosecutor's improper comments on the defendant's failure to make an exculpatory statement at the time of his arrest. The court also found that the evidence that four books with suggestive titles were found in the defendant's car was introduced solely to suggest the defendant's propensity to commit the crimes since they were not shown to have any relevance or materiality to the crimes charged, nor to the defendant's state of mind.

The State contends the evidence was probative and properly admitted because it made it more likely that any blow or series of blows delivered by the defendant could be severe enough to cause an individual's death. Further, it was within the court's discretion to determine whether the probative value of this evidence outweighed any potentially prejudicial effect.

We find the evidence was not improperly admitted. "In a criminal trial, the State may not bring forth evidence which only serves to cause the jury to believe a defendant to be a bad person, and hence likely to be guilty of the crime charged." (*People v. Miller* (1981), 101 Ill. App. 3d 1029, 1034.) "It is axiomatic that a defendant's guilt must be established by competent evidence uninfluenced by bias and prejudice" (*People v. Jordan* (1967), 38 Ill. 2d 83, 91) or by unjustified aspersions or insinuations tending to inflame the jury (*People v. Miller* (1981), 101 Ill. App. 3d 1029, 1034). The evidence must enlighten the trier of fact as to the guilt or innocence of the defendant and not serve only to prejudice and inflame the jury. *People v. Jordan* (1967), 38 Ill. 2d 83, 91.

"[E]vidence is admissible unless there is some distinct ground for refusing it, and evidence is relevant if it tends to make a proposition at issue either more or less probable ***." (*People v. Rachel* (1984), 123 Ill. App. 3d 600, 604-05.) The admission of evidence lies within the broad discretion of the trial judge (*People v. Frazier* (1984), 129

Ill. App. 3d 704, 709) whose function it is to balance the probative value and the prejudicial effect of offered evidence (*People v. Rachel* (1984), 123 Ill. App. 3d 600, 605). The court's determination to admit evidence or not will not be reversed absent an abuse of discretion to the prejudice of the defendant. (*People v. Frazier* (1984), 129 Ill. App. 3d 704, 709; *People v. Greer* (1980), 79 Ill. 2d 103, 117.) Evidence which is relevant and otherwise admissible will not be excluded even if it may also be prejudicial. *People v. Stewart* (1984), 122 Ill. App. 3d 546, 549; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 661.

Initially, we note that the fact of defendant's amateur boxing experience apparently was volunteered by him in the course of his voluntary oral statement made to the police. It is unclear what may have prompted this information to be divulged by the defendant, but it appears Investigator Krass was questioning him as to any possible motivation he may have had for hitting the child; *i.e.*, whether he was frustrated or depressed and may have lost control and taken it out on Jared. Defendant denied that he hit Jared and that "[h]e would never take his frustration or depressions out on his family. That if he ever got that mad—", and at that point Krass was interrupted by defense counsel's objection, apparently made in anticipation of her imminent testimony that the defendant said he was a boxer. A not unreasonable inference to be drawn from these circumstances is that defendant meant to suggest that he sought psychological release through the legitimate sport of boxing.

Contrary to the homosexuality in *Reimnitz* or the suggestive choice of reading material in *Malkiewicz*, we see nothing in amateur boxing which would inherently tend to engender prejudice or inflame the jury. Moreover, evidence the defendant had amateur boxing experience was highly probative of his particular ability to throw and land a punch on the body of another. Where the other evidence in the case showed the boy died as the result of multiple blunt trauma to virtually every aspect of his body—not the least of which trauma was that his liver was literally ripped apart—the relevance of defendant's boxing experience is undeniable, and it was not error for the court to admit it. Although the defendant suggests the evidence was unduly prejudicial by virtue of the prosecutor's closing argument analogizing the crime to "rounds" in a boxing match, we note defendant did not interpose a timely objection or raise that aspect of the issue in his post-trial motion. We find no reversible error in the prosecutor's argument.

■ The defendant's third contention of evidentiary error concerns the admission during Doctor Blum's testimony of evidence of

other, earlier injuries suffered by Jared. Defendant argues evidence of these older injuries served no purpose other than to raise the inference the defendant had a propensity to beat Jared and that such evidence violated the well-established Illinois prohibition against the introduction of evidence of other crimes as set forth in *People v. Lehman* (1955), 5 Ill. 2d 337. Defendant notes the case *People v. Platter* (1980), 89 Ill. App. 3d 803, in which evidence of prior beatings of the victim by the defendant was allowed in order to rebut the defendant's claim that he did not strike the victim with the intent specified in the charge against him. He distinguishes *Platter*, however, on the basis several witnesses there testified that the defendant had abused the child in the past whereas he asserts there was no evidence here that he had abused Jared in the past, and no evidence as to how the fractures or bruises occurred.

The State asserts initially that the defendant has waived this issue by failing to include it specifically in his post-trial motion, and we agree. (*People v. Howard* (1985), 139 Ill. App. 3d 755.) We note the defendant filed no reply brief suggesting we review this issue under the plain-error exception, although defendant did argue plain error during oral argument. We do not perceive any plain error occurred.

As the State notes, there was evidence that the defendant had spanked Jared in the past. In his statements to Investigator Krass, the defendant first denied hitting the boy, then admitted that he and Mary Jane spanked him over a month previously for defecating in his pants and for lying about it. The defendant told her he had "wooped [*sic*] Jared on the butt with a belt." He also told her that he had never seen or never had any complaints from Jared, that he never knew there were any broken bones, and said she was "lying" when she told him that X rays showed Jared had broken bones. We note Doctor Blanchard also testified to the fact that Jared's X rays revealed healed rib fractures and a healed fracture of the clavicle. Blanchard testified the defendant denied he hit Jared, and then later admitted he had spanked him earlier that day. Defendant did not object at trial to Krass' and Blanchard's references to Jared's broken bones. Doctor Blum's testimony was presented in order to establish the approximate date such broken bones may have occurred, and also included testimony of an undated fracture to Jared's upper right leg.

The general rule regarding the admission of evidence of other crimes has often been stated:

> "Generally, evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime. [Citation.] Evidence of the commission of other crimes is

admissible, however, when such evidence is relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake. [Citations.] In fact, \*\*\* evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime. [Citations.]" *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.

■ The State's evidence concerning Jared's previous injuries did not establish they were the result of a crime or that the defendant committed or participated in the commission of the crime. Nevertheless, such evidence was relevant and, therefore, admissible in light of the defendant's assertions to Investigator Krass that Jared never complained to him about hurting, that he was a healthy child and that he never knew that Jared had any broken bones. Although Doctor Blum was not asked his opinion as to the pain which might have been caused by these various fractures, the jury—based on its own observations and experiences in life—could readily have inferred Jared would have suffered pain from such fractures that would have been observable.

In sum, we conclude none of the evidentiary errors specified by the defendant deprived him of a fair trial, and no reversal on this basis is warranted.

■ ■ The defendant next contends he was not proved guilty of murder beyond a reasonable doubt. He asserts the State's evidence failed to exclude the reasonable hypothesis that someone or something else besides him caused Jared's death. His primary contention is that the State's expert witnesses' testimony regarding the time intervals between infliction of the injuries and Jared's death was inconsistent with the rest of the evidence and with the conclusion that only the defendant could have been responsible. Specifically, he notes that Doctor Blum testified death could have occurred anywhere between 20 minutes to 2 hours or up to 24 hours after the injury to the liver, and Blanchard testified the bruises on Jared's body were 8 to 14 hours old but possibly could have been fresher than 8 hours old. Defendant suggests that if the shorter time interval is accepted, there would had to have been more noise emanating from the defendant's apartment than that testified to by his downstairs neighbors, and if the longer time period is "closer to the truth," then the State's evidence fails to exclude Mary Jane Powell as the source of the injuries since she was with Jared during that time.

The evidence against the defendant in this case was solely circumstantial; as such, in order for his conviction to be sustained, his guilt

must be so thoroughly established as to exclude every reasonable hypothesis of innocence. (*People v. Garrett* (1975), 62 Ill. 2d 151.) The rule that reasonable hypotheses must be excluded by the proof does not require that the defendant's guilt need be proved beyond any possibility of doubt, however. (*People v. Branion* (1970), 47 Ill. 2d 70, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213.) What is required is that "the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." (*People v. Williams* (1977), 66 Ill. 2d 478, 484-85.) When the defendant elects to explain the circumstances, he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies. (*People v. Purnell* (1984), 126 Ill. App. 3d 608, 620; *People v. Canity*, (1981), 100 Ill. App. 3d 135, 152.) The State may exclude the defendant's theory by introducing evidence which indicates that the defendant is lying, since the jury is not compelled to accept the defendant's account of what happened at the time of the crime but may consider the surrounding circumstances and the probability or improbability of the defendant's story. (*People v. Heflin* (1978), 71 Ill. 2d 525, 533-34, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848.) Reversible error will be found in a circumstantial case where the trier of fact ignores exculpatory evidence regarding the defendant's presentation of a reasonable, probable defense; however, where no such defense can be found, the decision of the defendant's guilt or innocence will not be upset. *People v. Buss* (1983), 112 Ill. App. 3d 311, 318.

█ We do not find a reasonable hypothesis arising from the evidence in this record which is consistent with the defendant's innocence. Defendant acknowledges that the State's case "likely ruled out food poisoning as the cause of death and may well have questioned the believability of attributing death to a playground accident." However, he contends the State's evidence did not show he was the sole person in custody of Jared during the 24 hours preceding Jared's death and, thus, there remains the "reasonable hypothesis" that someone or something else caused the death in question. It is clear, though, that the jury was not bound to accept Doctor Blum's outside estimate of how much time could have elapsed between the infliction of the fatal injury to the liver and Jared's death. The jury could, and apparently did, accept the lower range of Doctor Blum's estimate, 20 minutes to 2 hours, which particularly coincides with testimony of Schenk and Tackett concerning the loud noises they heard coming from the defendant's upstairs apartment at about 8:30 p.m. Approxi-

mately two hours later, the defendant appeared at these witnesses' door carrying Jared, who never moved or made a sound, and whose condition shortly thereafter was described by the emergency-room nurse as "real dead." That is, Jared's arms and legs were cold and there was a film over the portion of his eyes not covered by his eyelids. The jury also must have considered the defendant's oral statements to the police which included denial of any loud noises occurring, and his representation that Jared was conscious and able to respond to him at the time he appeared at Schenk and Tackett's apartment door. The defendant had sole custody of Jared from shortly after 5 p.m. on the evening in question until he was pronounced dead shortly before 11 p.m. that same evening. That circumstance falls within Doctor Blum's time estimates between injury and death, as well as within Doctor Blanchard's, who agreed that the bruises found on Jared's body could be fresher than 8 to 14 hours old. Given evidence that Jared attended the birthday party with Mary Jane, sought out playing companions, played in the playground area, ate a cheeseburger, french fries and birthday cake and walked almost a mile home afterward picking up aluminum cans along the way, we find it inconceivable, as the jury must also have, that he could have been suffering at that same time from the extensive internal injuries which were later found to exist.

We conclude the State's evidence proved the defendant guilty beyond a reasonable doubt.

Defendant's final contention is that he was deprived of his sixth amendment right to a jury drawn from a fair cross section of the community because the prosecutor used a peremptory challenge to remove a black member of the venire. (U.S. Const., amend. VI.) This issue was not raised in defendant's post-trial motion and may be considered waived even though defendant objected to the challenge at trial. (*People v. Howard* (1985), 139 Ill. App. 3d 755.) Although defendant requests this issue be reviewed as plain error, he does not argue or present citations of authority in support of same, and we decline to so consider it. Moreover, the record suggests the juror in question was excused for reasons other than his race. He had been in court on child-custody matters, and, according to the "contacts" of the prosecutor, he had prior criminal arrests which were not shown on the venire contact cards which were provided to the parties by the court.

Defendant's suggestion that the cause be held in abeyance pending a decision by the United States Supreme Court in *Batson v. Kentucky* need not be addressed since that case was decided prior to

oral argument here. (*Batson v. Kentucky* (1986), 476 U.S. ___, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) *Batson* effectively overrules the suggestion in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, which has been adhered to in Illinois (see, *e.g., People v. Payne* (1983), 99 Ill. 2d 135, *cert. denied* (1984), 469 U.S. 1028, 83 L. Ed. 2d 372, 105 S. Ct. 447, and *People v. Williams* (1983), 97 Ill. 2d 252, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364), that only a showing of the systematic exclusion of blacks by peremptory challenges in case after case regardless of the particular circumstances involved would raise a constitutional issue. After *Batson*, a defendant may establish a *prima facie* case of purposeful discrimination solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. Two of the concurring justices and the two dissenting justices in *Batson* agreed that that decision should not be applied retroactively, and two cases considering the question of retroactive application of the *Batson* holding to cases pending on direct appeal are currently at issue. (*Griffith v. Kentucky, cert. granted* (1986), ___ U.S. ___, 90 L. Ed. 2d 717, 106 S. Ct. 2274; *Brown v. United States, cert. granted* (1986), ___ U.S. ___, 90 L. Ed. 2d 718, 106 S. Ct. 2275.) Even if the court should determine *Batson* should be given retroactive effect in such pending cases, and if the defendant here had not waived the issue by failing to include it in his post-trial motion, the record at bar fails to show the defendant established the *prima facie* case of purposeful discrimination described in *Batson*. In order to establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. The defendant may then rely on the fact that peremptory challenges constitute a jury-selection practice that permits those to discriminate who are of mind to discriminate. The defendant must then show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen on account of their race. By this combination of factors, the defendant may raise the necessary inference of purposeful discrimination.

 ██ In deciding whether the required showing has been made, the trial court may consider, for example, whether there has been a "pattern" of strikes and whether the prosecutor's questions and statements during *voir dire* and in exercising challenges either support or refute an inference of discriminatory purpose. If the court determines the inference has been raised, the burden shifts to the State to come forward with a neutral explanation for challenging the

veniremen, which explanation "need not rise to the level justifying exercise of a challenge for cause." (*Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 88, 106 S. Ct. 1712, 1723.) Based on this record, we believe the court could not have found that an inference of discriminatory purpose had been raised.

For the reasons expressed above, the judgment of the circuit court of Kane County is affirmed.

Judgment affirmed.

NASH, P.J., and REINHARD, J., concur.