NOTICE

Decision filed 01/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 231273-U

NO. 5-23-1273

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 20-CF-596 |
| | ) | |
| JULIA E. BEVELY, | ) | Honorable |
| | ) | Stephen R. Green, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err by admitting observational evidence regarding the bite mark on defendant's arm. The prosecutor's comment during rebuttal argument did not draw attention to defendant's failure to testify. The evidence was sufficient for a jury to find defendant guilty beyond a reasonable doubt.

¶ 2    In Williamson County Case No. 20-CF-596, defendant, Julia E. Bevely, was charged with three counts of first degree murder in violation of section 9-1(a) of the Criminal Code of 2012 (Code). 720 ILCS 5/9-1(a) (West 2020). Following a jury trial, defendant was convicted of first degree murder and sentenced to 55 years in prison. On direct appeal, defendant raises numerous issues. First, she argues that the trial court erred by admitting the testimony of a forensic odontologist regarding a bite mark on defendant's arm. Second, she argues that the trial court erred by failing to instruct or admonish the jury during the State's rebuttal argument when the State

1

commented on defendant's failure to testify at trial. Third, she argues that the cumulative effect of the errors deprived her of a fair trial. Finally, she argues that the evidence was insufficient to support a conviction for first degree murder. For the following reasons, we affirm defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4      This recitation of the facts includes only those necessary to resolve this appeal. We will recite additional facts in the analysis section as needed to address the specific arguments of the parties. The following evidence was presented at trial.

¶ 5      Defendant and Gregory Michael Beasley (Michael) began dating in 2013 and started living together within a year. Each had a prior child. Michael's prior child was Jade Beasley (Jade). Michael and Jade's mother; Jessica Bradley (Jessica), shared custody, and Jade spent every other week living with Michael and defendant. Although they never married, defendant and Michael had two children together. On the date in question, defendant's child from a previous relationship and her children with Michael were staying with other relatives. In 2018, defendant and Michael moved into a home outside of Marion, Illinois.

¶ 6      On Saturday, December 5, 2020, Michael went to work at the Cracker Barrel restaurant in Marion. He was scheduled to work from 8 a.m. to 2 p.m. Because of the COVID-19 pandemic, business at Cracker Barrel was slow, so Michael sometimes came home from work early. Defendant worked for Hyatt and was scheduled to work from home from 7:30 a.m. until 12:30 p.m., with a break from 9:30 a.m. until 9:45 a.m. When Michael left for work, 11-year-old Jade had just gone back to her bedroom after getting breakfast. Jade's mother, Jesssica, was to pick her up at 1 p.m. to go to birthday party.

2

¶ 7    Employment records showed that defendant took an extended break from work from 9:30 a.m. until 10:15 a.m. At 10:39 a.m., defendant sent Michael a text and asked him if he was off work. At approximately 11:05 a.m., defendant requested unapproved time off from her employer. Defendant's request was granted at 11:07 a.m. At 11:23 a.m., Michael replied to defendant's text and told her that he was still working but doubted he would "make it past 1:00." Defendant immediately responded, "Oh, okay."

¶ 8    At approximately 12:25 p.m., defendant called 911. She reported that she went to town to go to the store, and that when she came home, the front door was open. Defendant told the 911 operator that someone broke into her home, and that the person ran out of the home as she was about to walk in. Defendant reported that a man, dressed in all black, fled the scene on foot. Defendant did not see which way the man ran. She also reported that she was the only one in the home. Although the 911 call is not perfectly intelligible, defendant told the operator that she was the only one in the house, but that her stepdaughter, Jade, was "dead [unintelligible] in the bathtub" and had "multiple wounds all over her." Multiple units and an ambulance were dispatched to the home. While enroute, one unit spoke with a woman in a black hoodie who "was walking her dog or looking for her dog", and another unit saw an elderly couple who were walking a dog.

¶ 9    Officer Charles Welge of the Marion Police Department proceeded immediately to the scene, and he was the first to arrive. Welge entered the home and first saw defendant in the kitchen on the phone. He also noticed "large piles" of dried blood in front of the door. Welge asked defendant where the child was located, and defendant said, "back there" and pointed. Welge asked again, and defendant pointed to the rear of the house and said, "the bathroom." Welge noticed "a large amount of blood *** on the walls, the floors; um, everywhere throughout the house." Welge testified that the bathroom door was "kind of cracked open."

3

¶ 10    Upon opening the bathroom door, Welge found "a very bloody scene" with "blood that had been dried all over everything." Jade was in the tub, "on her feet kneeling with her hand on the side of the tub with her head in her hands facing the doorway." The water was on and the tub was filled with clear liquid. Welge turned the water off and touched Jade. Getting no response, he pulled Jade from the tub. She "was extremely cold" and not responsive. Welge placed Jade on the floor and checked her for injuries. Pulling back her shirt, he noticed a "large gaping hole in her chest cavity." The wound was not bleeding.

¶ 11    Officer Sloan, who stopped to speak with the woman in the black hoodie, arrived on the scene. Sloan described Jade as appearing "pale gray" and testified that her "lips were bluish in color." Welge and Sloan pulled Jade into the hallway and attempted life saving measures. Sloan noticed that Jade did not have a pulse and that she did not appear to be breathing. He so advised Welge, but Welge continued doing CPR. While doing CPR, Welge noticed that a watery, diluted bloody liquid was coming from the wound.

¶ 12    Defendant, who sat on the floor by the kitchen cabinets, asked if Jade was dead. Officer Sloan escorted defendant to the front porch. Sloan gave her a blanket from the couch. Officer Sam Ward of the Marion Police Department arrived and assisted Welge with the CPR before the paramedics arrived and took over. Ward described the blood in the house as "coagulated. Another term for that is candle wax form. It's dried blood, basically." After the paramedics took over, Officer Welge made sure that no one else was in the home and then canvassed the area with other officers, including Ward. Two K-9 officers also arrived on the scene and conducted searches of the nearby fields.

¶ 13    When Detective Kelley of the Williamson County Sheriff's Office arrived on the scene, defendant was sitting on the front deck, covered in a blanket. Detective Kelley was a patrol officer

4

at the time. Upon entering the home, he noticed that there was blood "all through the house." He testified that "[s]ome of the blood was coagulated." He had never seen so much blood before. Kelley stepped outside to speak with defendant to gather information on the possible suspect. Defendant told him Jade was sleeping when she left the house to go to town. After realizing that she forgot her debit and credit cards, she returned home. Defendant explained that as she approached the house, a white male in a black hoodie and gloves exited the door and attempted to stab her. Defendant could not describe the knife or tell him what direction the assailant ran. Defendant had a cut on her hand that was not bleeding. She declined medical attention. Because Jade's death appeared to be a homicide, Kelley called Detective Cindy Geittmann to the scene.

¶ 14    Detective Geittmann arrived on the scene. She noticed that the bottom of defendant's feet were clean despite the fact that she could see blood inside the door. When defendant showed Geittmann wounds on her hands, Geittmann noticed a bite mark on the inside of defendant's right forearm that appeared fresh. Defendant also had fresh scratches on her face. Geittmann also noticed a raised scar across defendant's left arm in the wrist area. Geittmann was present, along with Detective Carl Eggemeyer, for defendant's voluntary statement at the police station that afternoon.

¶ 15    Defendant's video recorded statement to the police was played for the jury. It had been edited for trial to exclude breaks. During her interview, defendant told police that she last saw Jade at 8 a.m. Defendant said that Jade was sleeping when she left the house to go to the Walmart in Carbondale, Illinois. She stated that she left for Walmart, taking her gray Nissan Pathfinder SUV, shortly after she logged off from work for the day. During the statement, defendant told the police the route that she drove, and that she parked in the Walmart parking lot before she realized that she forgot her wallet at home. Defendant was asked whether she stopped anywhere else, including for gas. She told the detectives she had not stopped anywhere else.

5

¶ 16　　Defendant also told the police that she was "pretty sure" she locked the front door when she left for the store. When she returned home, defendant said that she found the front door to the house was open. She told the police that a white man, dressed in black, exited the house as she was opening the screen door. The man was armed with a knife. Defendant told the detectives that she first tried to grab the knife with her left hand and then reached for the knife with her right hand. She sustained cuts to both hands. She said the man brushed past her and fled. Defendant told the police that she entered the home and went into the master bathroom to rinse her cuts, then put a towel over her cuts. She then went to check on Jade.

¶ 17　　Defendant told the police that she heard water running and ran to the bathroom. She found Jade slumped in the bathtub and saw knife wounds to Jade's back. Jade was wet. Defendant said she "kind of tapped" Jade on the shoulder, and not getting a response, she tried checking for a pulse with two fingers on her right hand. Defendant stated that she may have gotten some of Jade's blood on her at that time. Defendant said that she immediately called 911.

¶ 18　　When the detectives asked defendant how she got marks on her forearm, defendant told them that she "self-harms" and that she bit herself the night before, causing the marks on her right arm. Defendant also told the police that she was wearing flip-flops, but that they fell off as she ran through the house. She was barefoot after that. When accused of killing Jade, defendant started crying and said that she had not killed her. Defendant was not arrested following her interview, and she was allowed to leave the police station.

¶ 19　　During defendant's interview at the police station, Matthew Deschamps, from the Illinois State Police Crime Scenes Investigation Unit, collected DNA evidence from defendant. This included taking swabs from the bite mark on defendant's forearm. He also photographed defendant and her injuries, including injuries to her chin and eyebrow. From the police department,

6

Deschamps went to the scene of the crime. Deschamps arrived at the scene at 7:15 p.m. Deschamps took photos as he worked his way into the home. He did not see any signs of forced entry into the house. Deschamps found red, bloodlike substance (RBLS) on the floors and walls throughout most of the house, including the living room, kitchen, hallway and Jade's bedroom. Deschamps also noticed RBLS on the carpet in the master bedroom leading to the master bathroom. In the master bathroom, Deschamps found an RBLS mark on the sink. During this and subsequent trips to the scene, Deschamps collected swabs for DNA testing. Due to the amount of blood, the different patterns "and the fact that it *** kind of encompassed the whole residence," Deschamps requested the assistance of a bloodstain pattern analyst.

¶ 20    In response to Deschamps's request, Dewayne Morris, a blood spatter expert from the Illinois State Police Division of Forensic Services, came to the house at 10:30 p.m. Morris testified that there was a "great deal of blood shed throughout this home." As a part of his investigation, Morris noted 39 transfer stains, meaning that the blood did not travel through the air, rather it was placed there by contact with a bloody object. Morris also identified 12 areas of blood spatter, meaning that the blood "traveled through the air to arrive on the surface that it wound up on." One of the blood spatter patterns was a "drip trail," meaning that the person was moving when the blood was deposited. The drip trail ran between the front door and the bathroom. There were transfer stains on both sides of Jade's bedroom door, and on the bedroom wall behind the door to Jade's bedroom. The door would have been closed when this transfer pattern was placed on the wall. Morris noted that there was very little visible blood in the master bathroom. There was a small spatter on the sink that appeared to have been diluted. Morris stated that he had worked "hundreds of death scenes with blood" and that this was "probably in the top five of blood scenes *** for volume."

7

¶ 21     Deschamps attended Jade's autopsy the morning of December 6, 2020. He collected her clothes, and pursuant to policy, various samples from Jade, including a blood standard, buccal swabs, fingernail scrapings and hair. The pathologist testified that Jade suffered 104 "sharp injuries." Jade had wounds to her back, some of which penetrated her lungs. She also sustained four wounds to her chest that penetrated her right lung. Additional wounds were noted on her right shoulder, and "a number of smaller, very superficial sharp injuries on the face, neck and chest region." Jade also had defensive wounds on both hands.

¶ 22     Following the autopsy, Deschamps returned to the home. One of the reasons for returning to the home was so that he could spray leucocrystal violet (LCV) in order to enhance blood patterns and to detect latent blood that is not visible to the naked eye. LCV reacts to trace amounts of blood, even blood that has been cleaned or mixed with a cleaner, by turning purple. The purple coloration is "a presumptive confirmatory test for the presence of blood." Deschamps found latent footprints in the kitchen that led to the master bedroom. More latent footprints led from the hallway to the front of the house. The floor in front of the sink in the master bathroom reacted to the LCV and turned purple. Deschamps testified that some of the patterns present at this location were circular. The sink and faucet also had a positive reaction to the LCV. These patterns were not visible to the naked eye when Deschamps first processed the scene.

¶ 23     Deschamps also processed defendant's vehicle. He documented a RBLS on the steering wheel cover of defendant's Nissan Pathfinder, as well as the gear shift and the interior of the driver door. The exterior driver's side door handle reacted positively to the application of LCV by turning purple.

¶ 24    On his third trip to the home, Deschamps used LCV to enhance ridge details from fingerprints, palm prints and footprints. LCV hardens as it dries and makes it easier to see the details. Two of the footprints were ultimately matched to footprints taken from Jade at the morgue.

¶ 25    Deschamps photographed defendant again on December 8, 2020, at the Johnston City Police Department. He took more photos of the bite mark on defendant's arm. He also took photos of abrasions on defendant's left arm. These abrasions were in the same location as defendant's raised scar; however they were not present at the time defendant was photographed on December 5, 2020.

¶ 26    Over defendant's objections, Dr. David Wold, a board certified forensic odontologist, testified regarding the bite mark on defendant's right arm. His testimony was the subject of a pretrial motion *in limine* filed by defendant. Defendant sought to bar all of Dr. Wold's testimony based upon this court's decision in *People v. Prante*, 2021 IL App (5th) 200074, *aff'd in part, rev'd in part, and remanded*, 2023 IL 127241.[1] In denying defendant's motion *in limine*, the trial court distinguished this court's decision in *Prante*. The court noted that Dr. Wold's proposed testimony, that the "mark on the defendant could not be made by the defendant as she claims in her interview because of specific characteristics of defendant's teeth" was not scientific evidence subject to a *Frye* analysis, but instead was "observational evidence" that is not subject to *Frye*. Accordingly, the court ruled that "the State can offer observation evidence of the Defendant's obvious teeth irregularities to suggest that the Defendant could not have made the wound as claimed." In response to defendant's motion to reconsider its ruling on this issue, the court clarified:

---

[1]The Illinois Supreme Court decision in *Prante* was not decided until after defendant's trial. This court's decision in *Prante* was reversed, in part, on other grounds. Although remanded to this court for resolution of the petitioner's other claims, no decision was rendered by this court due to the petitioner's death.

"There can be no evidence offered as to the detention of the victim. There will be no expert testimony allowed that the bite mark on the Defendant was caused by the victim. The State can only offer observation evidence of the Defendant's *obvious teeth irregularities* compared to the wound and point out discrepancies." (Emphasis in original.)

¶ 27 The State later sought clarification of the court's order, asking whether observational evidence that Jade was missing some teeth, and what teeth were missing, would be allowed. The State indicated that Dr. Wold would not testify that Jade's teeth made the mark on defendant's arm. In issuing an oral ruling, the judge stated that the State could offer observational evidence that the casts of Jade's teeth were missing some teeth, but that the State could not offer evidence that Jade's teeth caused the injury to defendant's arm. Defendant renewed her objection to the evidence prior to Dr. Wold's testimony. The court overruled her objection.

¶ 28 Dr. Wold testified that he reviewed photographs of the bite mark on defendant's right arm, dental impressions taken from defendant and Jade, and dental molds made from those impressions. Dr. Wold was aware of defendant's statement to the police that she bit herself on her right arm. Dr. Wold made a duplicate of the master casts to preserve the integrity of the originals. With regard to one of the photos, Dr. Wold testified that he saw a "pattern injury on [defendant's] right forearm that, um, through further analysis it was confirmed to be a bite mark." Defendant's objection to this statement was sustained. Dr. Wold further testified that he used Adobe Photo Shop to enhance some of the photos, and that based upon "the position of the arm and the angulation of the arches," he did not think it reasonable to conclude that the bite mark was self-inflicted. Wold also testified, assuming the mark was a bite mark, that it was a "forceful" bite, in that it was not just the biting edges, but also the inside part of the upper teeth that marked the compression of the tissue and the

10

biting edges of the lower teeth actually cut into the tissue. After looking at one of the photos Dr. Wold had enhanced, he testified that there was an area of the injury that was not impacted by a tooth. He then testified that the cast of Jade's teeth had an irregularity in that she was missing a tooth on the "upper right canine side."

¶ 29    The State presented DNA testimony regarding the evidence collected from both defendant and Jade. Brian Hapack, a forensic biology DNA analyst with the Illinois State Police testified that he tested two swabs taken from the bite mark area of defendant's arm and that they contained a mixture of DNA. One swab matched "the information Jade Beasley possessed" and the "statistical rarity of that foreign DNA profile in the general population" would be "about one out of 160,000 individuals." Regarding the second swab taken from the bite mark area, Hapack could not exclude Jade as a contributor, and the "statistical rarity of it is such that [he] would expect it to occur once out of every 240 quintillion individuals." Hapack also testified, on cross-examination, that he did not have information as to the source of biological fluid that might have been present on the swab taken from defendant's left arm, meaning he did know whether blood or saliva were present on the swab. Earlier testimony by another State witness explained that the crime lab limits testing of swabs with potential saliva because they cannot physically see the how much saliva is on the swab and because doing so could limit the remaining sample size for DNA testing.

¶ 30    Hapack also offered testimony that defendant could not be excluded as the major contributor to the sample taken from the steering wheel cover. With regard to the sample collected from the floor in front of the sink in the master bathroom, defendant could not be excluded as the major contributor (statistical rarity of one out of 770 sextillion individuals) and Jade could not be excluded as the minor contributor (statistical rarity of one out of 2.4 million individuals). Concerning the sample collected from a bloody footprint in the hallway, it contained a single

11

contributor. Jade could not be excluded as the source (statistical rarity of one out of 85 septillion individuals). With respect to the sample collected from the bloody footprint near the front door, Jade could not be excluded as the major contributor (one out of 2.8 billion individuals). Hapack also testified regarding the test results taken from Jade's fingernail scrapings. The scrapings from one hand came from a single source, Jade herself. The scrapings from the other hand contained a mixture of two individuals: Jade was the major contributor, and defendant could not be excluded as the minor contributor (one out of every 950 million individuals). Regarding the sexual assault kit collected during Jade's autopsy, Hapack testified that the swabs contained only Jade's DNA. Finally, regarding the knives seized from the kitchen sink, Hapack testified that the testing from one of the knives was inconclusive, and the testing for the other contained male DNA that was later determined to be contamination from Deschamps.

¶ 31    Jade's father, Michael, testified that his relationship with defendant began in 2013, and that they moved in with one another within a year. In describing defendant's relationship with Jade, Michael described it as "normal" although defendant would be "a little dismissive of" Jade. Defendant did not tell him that she was getting off work early or going to Carbondale on December 5, 2020. After the murder, but before her arrest, defendant told Michael that she went to Carbondale, and upon her return, she was attacked and then she found Jade. Michael also testified that he had never seen defendant cut herself or bite herself, and that he never saw a bite mark on her body. Michael told the jury that when he returned to the home to collect his property, nothing was missing. On cross-examination, Michael agreed that they were "a pretty close-knit, blended family" and that he had never seen defendant become violent during their arguments.

¶ 32    Based upon defendant's claim that she drove to Walmart in Carbondale, the police gathered the video from the Walmart parking lot and from businesses along the route that defendant claimed

12

she took to Walmart. Contrary to defendant's claim that she parked in the Walmart parking lot before realizing that she forgot her debit and credit cards, the police did not see a vehicle matching defendant's pull into the lot. Except for two residential cameras and video from a Huck's gas station in Marion, none of other surveillance videos along the route contained footage of a car matching defendant's during the relevant time period.

¶ 33    Aaron Newlin lived on Khoury League Road, "right around the corner" from defendant's home. On the date in question, Newlin became aware that the police were looking for a male subject. He brought his children into the house and proceeded to watch and review his security videos. He never saw a man dressed in black on his video cameras. Newlin later learned the police were looking for footage of a specific vehicle. Although the time stamp on his cameras was 44 minutes fast, one of his cameras captured a gray SUV traveling westbound at approximately 11:36 a.m. The video also showed a gray vehicle traveling eastbound at approximately 11:48 a.m. The second residential camera was from a home on Fietsam Road. The video from this camera showed a gray SUV traveling westbound at approximately 11:38 a.m. and then traveling eastbound at approximately 11:46 a.m.

¶ 34    Video from a Huck's convenience store in Marion was also recovered. This video showed[2] a vehicle matching defendant's SUV pull up next to a pump at approximately 11:42 a.m. The driver pulled an object out of the SUV and place it in the trash can. Other testimony established that the Huck's convenience store was six to seven minutes from defendant's home. After the police determined that the trash from Huck's was previously picked up, they conducted a search of the local landfill where the trash was taken. Using GPS data from the garbage trucks, the search was limited to that portion of the landfill where it was likely the Huck's garbage was dumped.

_____

[2]The video from Huck's is not a part of the record on appeal.

Over the course of two days, approximately two dozen people searched through the trash. The search yielded two broken knife blades and a shower curtain. None of these items were linked to either the Huck's or the crime.

¶ 35　Defendant's cell phone records were subpoenaed. Evidence was presented that defendant's cell phone was at the house until shortly after 11:32 a.m. It began moving at approximately 11:36 a.m. and moved past Newlin's residence. At approximately 11:38 a.m., it moved past the home on Fietsam Road, heading west, before stopping at Huck's at 11:42 a.m. At 11:46 a.m., the cell phone was again near the home on Fietsam Road before passing by the Newlin residence at 11:48 a.m. Defendant's cell phone was back at the house at about 11:53 a.m. where it remained until past 12:30 p.m. Defendant's cell phone neither appeared to travel past Huck's nor to travel to the Walmart in Carbondale. Evidence was also presented that the Carbondale Walmart was approximately 19 miles from defendant's home and that the drive to the Walmart would take about 29 minutes.

¶ 36　Jessica Bradley, Jade's mother, testified that Jade and defendant "got along as best as those two types of people could get along." She also offered that, in response to her asking whether defendant was nice to Jade, Jade would respond, "like, Yeah. Everything's fine." Jessica testified that, on December 5, 2020, she was supposed to pick Jade up at 1 p.m. to take her to her two year old half-sister's birthday party. She tried to contact Jade that day but received no response. The police were there when she arrived at the house and stopped her from entering the home. Jessica saw defendant sitting on the porch, hunched over, staring straight ahead and rocking slightly back and forth. When the EMT's brought Jade out on a stretcher, she looked "incredibly pale" and her arm was "kind of flopping off the side of the stretcher." She noticed "what looked to be

14

bloodstaining on the sheet" that was covering Jade's body. Jessica testified "that was the last time I saw her."

¶ 37 Jessica also testified that she had conversations with Jade about defending herself. Due to an increase in sex trafficking and abductions in the area, she told Jade "that if anyone *** tried to do anything to her *** , that she was to kick, bite, scratch, scream, claw, pull hair, do whatever she had to do to try to get away from that person. And if she knew that she was not going to get away, she needed to make sure that she took a part of the person with her or that she left *** part of herself on that person."

¶ 38 As a part of her case in chief, defendant called Dr. Karl Reich, an expert in forensic DNA and forensic biology.[3] Dr. Reich noted that the State had not tested the swabs taken from defendant's arms to determine the presence of bodily fluids, such as blood or saliva. Per Dr. Reich, blood and saliva are "rich sources of DNA." Since the swab from the bite mark on defendant's left arm contained roughly the same amount of DNA from defendant and Jade, Reich opined that "it's unlikely that either of the DNA comes from a rich source, like, saliva or blood." He further testified that a person wrapped in a household blanket used by others could have someone else's DNA transferred onto them. Regarding the fingernail scrapings taken from Jade, Dr. Reich opined that the amount of defendant's DNA found there was consistent with touch DNA and that he would expect that a greater amount of DNA had it been the result of someone being scraped during a violent assault. Dr. Reich also noted that Jade's fingernail scrapings contained .0007 nanograms of male DNA, which is a sufficient amount for testing. During cross-examination, Dr. Reich testified that "science does not allow the determination of a mark as coming from a bite" and that

_____

[3]To accommodate Dr. Reich's schedule, he was called as a defense witness during the State's case in chief. Immediately following his testimony, the State recalled Brian Hapack to rebut Dr. Reich's testimony.

15

"there is certainly no way to compare bite marks." He also testified that the presence of DNA does not explain when or how the DNA was deposited on the sampled item.

¶ 39    Defendant also called several character witnesses who testified that they had never seen defendant act violently or use corporal punishment. The witnesses testified that when upset or angry, defendant would cry or withdraw.

¶ 40    After the close of the evidence, one of the jurors reported that she thought she was being recorded by a woman in a vehicle that was marked "Justice for Jade." The juror brought the matter to the attention of the bailiff and identified the woman as being present in the courtroom. The court had off the record discussions with both attorneys before having an on-the-record discussion in the presence of the defendant. The court explained that it discussed the matter with the attorneys, and that they decided to let the judge question the juror in his chamber and outside the presence of the parties and the other jurors. The judge explained:

> "The question would be about that specific incident and whether that incident would impact that person's ability to be fair and impartial in this case. Another question would be whether she communicated her observation to any other juror or to any other person. Depending upon that answer, more things may need to be done. Potentially she could say that she could be fair, and if she does, that would end the inquiry. If she says she cannot be fair, then I believe, by agreement, both sides are going to excuse that particular person from jury service, and that person would be released now."

The court confirmed that defendant discussed this matter with her attorney and that she was in agreement with the procedure. Defendant herself offered to speak with the woman in question, telling the court that she was a friend. The judge then questioned the juror in the presence of a

16

court reporter. Based upon the information he received while questioning the first juror, the judge questioned three additional jurors. All four jurors indicated that they could be fair and impartial.

¶ 41　Defense counsel asked to see a copy of the transcript from the trial court's conversations with the jurors, which was allowed. Following her review of the transcript, defense counsel moved for a mistrial, believing that the proceedings "may be tainted." That motion was denied and the parties proceeded to closing arguments.

¶ 42　During closing argument, the State noted that "the problem with [defendant's] Walmart story is her cell phone" because defendant told the police that she had her cell phone with her, but that the evidence demonstrated that defendant did not go to Walmart. The State argued defendant did not tell the police that she stopped at Huck's, and yet the video from Huck's showed defendant pulling into Huck's, getting out of her vehicle and throwing something away before pulling back onto the road and heading in the direction of her house.

¶ 43　In defendant's closing argument, defense counsel argued that "the State expects you to believe that [defendant] committed this horrible crime, collected all of the evidence, put it in something that we think we can see on the Huck's video that might have been somewhere [*sic*] the size of a small bag." Defense counsel later argued, that "[t]he only crime that [defendant] committed was that she didn't make it all the way to Carbondale." Defense counsel acknowledged that the Huck's video showed "a car with a phone in it. It belongs to Julie."

¶ 44　The following exchange occurred at the outset of the State's rebuttal argument:

> [THE STATE]: What just happened? What? Two weeks. Everything you heard in this courtroom, the first time you hear anything—anything about Julia going to anywhere but Walmart comes out of her attorney's mouth. Not her own.
>
> [DEFENSE COUNSEL]: Objection, your Honor.

17

[THE STATE]: Not her own mouth.

[THE COURT]: What's the objection?

[DEFENSE COUNSEL]: The defendant has the right to remain silent.

[THE COURT]: Well—

[THE STATE]: I will move on, your Honor. Thank you."

The trial court never ruled on defendant's objection.

¶ 45　The jury found defendant guilty of first degree murder. Following a hearing on defendant's posttrial motion, the trial court sentenced defendant to 55 years in prison. Defendant's motion to reconsider sentence was denied on December 8, 2023. Defendant's timely notice of appeal was filed on December 12, 2023.

¶ 46　　　　　　　　　　　　　II. ANALYSIS

¶ 47　Defendant raises numerous issues on appeal. First, she argues that the trial court erred by admitting the testimony of Dr. David Wold, the forensic odontologist who testified regarding a bite mark on defendant's arm. Second, defendant argues that the trial court erred by failing to instruct or admonish the jury during the State's rebuttal argument when the State commented on defendant's failure to testify at trial. Third, defendant argues that the cumulative effect of the errors deprived defendant of a fair trial. Finally, defendant argues that the evidence was insufficient to support a conviction for first degree murder. We address each argument in turn and ultimately affirm.

¶ 48　First, we consider defendant's claims as it relates to bite mark evidence. Defendant argues that the trial court erred by admitting Dr. Wold's testimony. "The admission of evidence lies within the sound discretion of the trial court, and a reviewing court will review the trial court's ruling only for an abuse of discretion." *People v. Leak*, 398 Ill. App. 3d 798, 824 (2010). As noted above,

Dr. Wold's testimony was the subject of a defense motion *in limine*. In his motion, defendant argued that "[f]orensic odontology and bite mark evidence is no longer generally accepted within the scientific community as a mean of identification or as a means to identify a mark or wound as a human bite mark." In support of her contention that Wold's testimony should be barred, defendant relied upon this court's decision in *Prante*, 2021 IL App (5th) 200074.

¶ 49    In *Prante*, the petitioner filed a petition for leave to file a successive postconviction petition, claiming that developments in the field of bite mark evidence called into question its continued validity and reliability. *Id.* ¶ 1. The trial court denied the petition for leave to file. *Id.* In his appeal to this court, we noted that during petitioner's trial, State experts testified that the injuries on the murder victim were human bite marks and that petitioner's teeth were consistent with the victim's injury, with one expert testifying that petitioner's " 'teeth could have made the bite mark. Period.' " *Id.* ¶ 29. This court also noted that petitioner called an expert at trial who testified that the injury to the victim " 'could be a bite mark' but that these marks also could have been caused by other trauma, such as through strangulation, or could have been left by jewelry or a heel." *Id.* ¶ 38. This court then noted that, in support of his petition for leave to file a successive postconviction petition, petitioner had submitted "affidavits and other documents suggesting that the current scientific community recognizes a lack of consensus on whether forensic dentists have the ability to reliably identify injuries as human bite marks or to associate those bite marks with an individual." *Id.* ¶ 51.

¶ 50    Noting that the admission of scientific expert testimony in Illinois is governed by the standard expressed in *Frye v. United States* (293 F. 1013 (D.C. Cir. 1923)) (*Prante*, 2021 IL App (5th) 200074, ¶ 65), this court also noted that not all expert testimony is subject to the *Frye* analysis, rather it is only scientific evidence that is subjected to that standard. *Id.* ¶ 69. The *Prante*

19

court considered the history of the admissibility of bite mark evidence in Illinois beginning with *People v. Milone* 43 Ill. App. 3d 385 (1976), "the seminal case on the admission of bite mark evidence in Illinois" and "the first reported case in Illinois to discuss the issues raised in *Frye*." *Id.* ¶ 70.

¶ 51    In *Milone*, the defendant challenged the admissibility of bite mark evidence that was used to identify him as the murderer, arguing that bite mark evidence "had not gained general acceptance in the particular field in which it belonged, as required by *Frye*." *Prante*, 2021 IL App (5th) 200074, ¶ 70 (citing *Milone*, 43 Ill. App. 3d at 394). The defendant in *Milone* also "argued that bite mark identification evidence failed to meet the 'prior reliability' test utilized by the Illinois Supreme Court" in *People v. Jennings*, 252 Ill. 534 (1911). *Id.* ¶ 70. Ultimately, the *Milone* court found no error in the admission of bite mark evidence that was used to identify the defendant as the murderer. *Id.* Because bite mark evidence comparison " 'involves only a visual comparison between the wound and the detention of the defendant' " and because bite mark evidence lacks an " 'intermediate mechanical stage in which the reliability [of the evidence] may be questioned[,]' " the *Milone* court found " '[s]uch evidence is more analogous to footprint, fingerprint, and hair, comparisons which are made for purposes of identification.' " *Id.* ¶ 70 (quoting *Milone*, 43 Ill. App. 3d at 396.)

¶ 52    The *Prante* court rejected the *Milone* court's limited application of *Frye*, finding that "[t]oday, in determining whether *Frye* applies, courts examine whether the expert's testimony is the " 'product of scientific tests or studies.' " *Id.* ¶ 76 (quoting *People v. McKown*, 226 Ill. 2d 245, 254 (2007)). The *Prante* court found that "[t]here is no requirement that the scientific methodology employed by the expert involve an 'intermediate mechanical stage' for *Frye* to apply." *Id.* Accordingly, this court concluded that "bite mark evidence is 'scientific evidence' within the

meaning of *Frye* because it purports to employ a scientific process requiring examination and analysis by an expert trained in interpreting the evidence." *Id.*

¶ 53 As noted above, in ruling on defendant's motion *in limine*, the trial court ruled that *Prante* would preclude the admission of "testimony that would lend to a conclusion that the wound was made by a human or allow comparison evidence that a particular set of teeth made that wound." Accordingly, the trial court ruled that the State could not present such testimony. Relying on *Milone*, however, the court also ruled that the State could present "observational evidence of the Defendant's obvious teeth irregularities to suggest that the Defendant could not have made the wound as claimed" by defendant in her interview with the police. As also noted, the court later agreed that the State could present observational evidence of irregularities to Jade's teeth, provided that Dr. Wold would not testify that Jade's teeth made the wound on defendant's arm.

¶ 54 Because defendant herself told the police that the injury on her arm was a bite mark, albeit self-inflicted, the issue before this court is whether Dr. Wold's observational testimony that Jade was missing a tooth and whether there was any place on the injury that was not impacted by a tooth was error. Under the specific facts of this case, we find this evidence was observational evidence consistent with this court's decision in *Prante*. See *id.* ¶ 95, n.3 (noting that the National Academy of Science's 2009 report, *Strengthening Forensic Science in the United States: A Path Forward* [https://perma.cc/2PTA-F47C] acknowledged that "forensic odontologists understand the anatomy of teeth and the mechanics of biting and can retrieve sufficient information for bite marks on skin to assist in criminal investigations and provide testimony at criminal trials" even though there was no scientific basis for the conclusion that bite mark comparisons can result in a conclusive match.) Accordingly, we find that the trial court did not abuse its discretion by allowing this testimony.

¶ 55    We understand defendant's concern that observational evidence of this type allows the State, in the absence of a *Frye* hearing, to use an expert to compare a bite mark to known dentitions and testify that one dentition is consistent with a wound and that another dentition is inconsistent with a wound. As noted by the *Prante* court: "The persuasiveness of seemingly objective, truthful scientific evidence cannot be ignored or understated. The recognition that 'scientific' evidence 'carries a greater weight in the eyes of the jury' because it is 'equated with the truth' is precisely why Illinois courts require scientific evidence to meet the *Frye* standard." *Id.* ¶ 84 (quoting *People v. McKown*, 226 Ill. 2d 245, 254 (2007)). However, whether this court's decision in *Prante* should be extended to preclude observational evidence of a known bite mark when compared to a defendant's or victim's dentition need not be decided based upon the facts of this case. Even if the admission of Dr. Wold's testimony in the absence of meeting the *Frye* standard was error, it is harmless error due to the overwhelming evidence of defendant's guilt as discussed below, including the fact that Jade's DNA was found on the wound itself.

¶ 56    Defendant next argues that the trial court erred by failing to instruct or admonish the jury during its rebuttal argument when the prosecutor stated: "What just happened? What? Two weeks. Everything you heard in this courtroom, the first time you hear anything—anything about Julia going to anywhere but Walmart comes out of her attorney's mouth. Not her own." As noted above, defense counsel objected, but the State "moved on" before the trial court ruled on the objection. Defendant properly preserved this argument in her posttrial motion.

¶ 57    During the hearing on defendant's posttrial motion, the prosecutor defended her remarks, claiming that defense counsel invited her comment by presenting the jury "with a defense they never heard." The prosecutor asked, "Am I supposed to let counsel just come up with an alibi and give it to the jury, and I can't rebut that?" The prosecutor also suggested that the reference to "not

22

out of her mouth" referred to the fact that defendant's statement had been played for jury and that defendant failed to tell the police that she went to the gas station. In ruling on this issue, the trial court commented:

> "At the time that that occurred, my memory is similar to the State's that defense counsel, whether you meant it or not, make a reference of a stop that wasn't in evidence at all. The only place that that could be inferred from is from the tape of the defendant. There was no testimony. At the same time, when [the prosecutor] was making her comments, I did initially think that she was going too far. But then when I considered it, I didn't think so. I don't think that she was commenting at all about the defendant's refusal to take the stand in Court, so that will be denied."

¶ 58    In response to defendant's arguments, the State contends that the prosecutor's comments were invited by defense counsel's closing argument and in the alternative, if the prosecutor's comments were error, they were harmless error.

¶ 59    "An accused has a constitutional right not to testify as a witness in his own behalf [citation omitted], and the prosecutor is forbidden to make direct or indirect comment on the exercise of that right." *People v. Arman*, 131 Ill. 2d 115, 125-26 (1989) (citing *Griffin v. California*, 380 U.S. 609 (1965), *People v. Ramirez*, 98 Ill. 2d 439, 450-51 (1983) and *People v. Dixon*, 91 Ill. 2d 346, 350 (1982)). "In determining whether improper comment has been made on a defendant's failure to take the witness stand and testify, a court will consider whether the reference was intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify." (Internal quotation marks omitted.) *Id.* at 126 (citing *Dixon*, 91 Ill. 2d at 350; *People v. Hopkins*, 52 Ill. 2d 1, 6 (1972); *People v. Morgan*, 112 Ill. 2d 111, 133-34 (1986)). "In making that determination, a reviewing court should examine the challenged comments in the

23

context of the entire proceeding." *Id.* (citing *United States v. Robinson*, 485 U.S. 25, 33 (1988); *Hopkins*, 52 Ill. 2d at 6).

¶ 60    During closing argument, defense counsel acknowledged that defendant did not make it to the Carbondale Walmart. Defense counsel argued, "The only crime [defendant] committed was that she didn't make it all the way to Carbondale." She followed this up by acknowledging that defendant's car and cell phone were seen on video at the Huck's convenience store. This acknowledgment was contrary to defendant's statement to the police during which she denied stopping anywhere while driving to Walmart and was the first time that jury heard anything from the defense acknowledging the stop at Huck's.

¶ 61    We find no error in the State's response to defense counsel's argument. The jury heard nearly two hours of defendant's statement to the police during which she told the police, more than once, that she had not stopped anywhere on her claimed trip to the Carbondale Walmart. During the hearing on defendant's posttrial motion, the prosecutor stated that the comment was invited by defense counsel's argument, and that her comments were in reference to defendant's two hour statement to the police during which defendant failed to mention her stop at Huck's. Under these circumstances, we do not find that the prosecutor's comments were intended or calculated to direct the jury's attention to the defendant's failure to testify.

¶ 62    We next consider defendant's claim that the evidence was insufficient to prove her guilt beyond a reasonable doubt. Defendant argues: (1) the "State only introduced speculative evidence of defendant's opportunity and means to commit the murder"; (2) the time of death was "uncertain"; (3) the DNA evidence "was insufficient to prove anything"; (4) defendant's failure to tell the police that she stopped at the Huck's "was insufficient to prove anything"; (5) the evidence recovered from the landfill was never connected to Jade's murder; and (6) the evidence presented

24

did not support the State's claim that defendant "could have single-handedly committed the brutal murder herself." The State responds, arguing that defendant asks this court to reweigh the evidence. We agree with the State.

¶ 63    When considering a challenge to the sufficiency of the evidence, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)).

¶ 64    This standard of review "is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial." *People v. Campbell*, 146 Ill. 2d 363, 374 (1992) (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Circumstantial evidence is sufficient to support "a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Id.* at 379. This "standard gives 'full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* at 375 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). For this reason, a reviewing court "will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is

so unreasonable, so improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 65 Defendant argues that the State's evidence regarding defendant's opportunity and means was speculative. We disagree. The evidence presented established that Jade was alive when her father, Michael, left the house that morning, and that defendant was the only other person in the home. Defendant's arguments about the possibility of an intruder are based solely upon her self-serving statement to the police, parts of which were demonstrably false. While enroute to the scene, police looked for people matching the alleged assailant's description and conducted canine searches of the area for signs of a suspect. There were no signs of forced entry, and nothing appeared to be stolen from the home. The swabs from Jade's sexual assault kit contained only her DNA, suggesting no sexual assault occurred. In short, no evidence supporting defendant's claim of an intruder was found. Being the only person in the home besides Jade, the evidence established that defendant had the opportunity to commit this offense.

¶ 66 Regarding the means, although none of the recovered knives were tied to the murder, several knives were present in the home, and two knives were recovered from the search at the landfill. Insofar as the time of Jade's death is concerned, the evidence demonstrated that she was killed sometime between when her father left the home and before the police arrived following defendant's 12:24 p.m. call to 911. We note that when the police arrived shortly after 12:30 p.m., they observed that some of the blood was already dried and other pools of blood were coagulating or "waxy." This suggests that Jade's murder did not occur between the time defendant left the home at approximately 11:36 a.m. and the arrival of the police less than an hour later.

¶ 67 Considering the DNA evidence, Jade's DNA was found on defendant's arm and in the location of what defendant claimed was a self-inflicted bite mark. Additionally, defendant's DNA

26

was found under Jade's fingernails. While defendant argues that the amount of DNA recovered from these two locations is consistent with household or touch DNA, it is also reasonable to infer that the DNA recovered from the wound on defendant's arm was consistent with a struggle during which Jade bit defendant and the DNA recovered from under Jade's fingernails was consistent with scratches on defendant's chin and above her eye. We note that defendant told the police that she rinsed her hands before checking on Jade, and that the first officer on the scene found Jade in the bathtub with the water running and the tub full of clear liquid. We also note that Jade's mother, Jessica, testified that she taught Jade that, if attacked, she should "kick, bite, scratch, scream, claw, pull hair, do whatever she had to do to get away from that person. And if she knew that she was not going to get away, she needed to make sure that she took a part of that person with her or that she left *** a part of herself on that person." Contrary to defendant's argument that the DNA evidence "was insufficient to prove anything", a jury could reasonably infer that Jade did exactly as her mother told her, and that the DNA found under Jade's fingernails and on defendant's arm was the result of Jade's attempts to defend herself from defendant's attack.

¶ 68     With regard to the traces of blood containing both Jade's and defendant's DNA being found on the floor of the master bathroom, defendant argues that traces of blood in a bathroom that is used several times a day is not uncommon. Defendant also argues there was no evidence the blood had been deposited there the day of the murder and, further, there was no evidence that any attempts were made to clean the bathroom that day. We disagree. The evidence demonstrated that blood tracked from the living room into the master bedroom and toward the bathroom. After application of LCV, traces of blood and Jade's DNA were found on the bathroom floor in front of the vanity. Crime scene investigator Deschamps testified that the LCV stains from the floor of the master bathroom contained "patterns" and that some of the patterns were "circular." Photos

admitted into evidence and published to the jury depict the purple LCV stains (representing the presumptive blood) that appear to have been wiped in a semi-circular pattern. Defendant told the police that after entering the house and before checking on Jade, she went into the bathroom and quickly rinsed her hands. Given that the only visible RBLS in the bathroom was a diluted drop of blood on the vanity top that matched defendant's DNA, it is reasonable to infer that defendant tracked Jade's blood into the bathroom and cleaned the bathroom, and herself, before disposing of evidence at Huck's.

¶ 69 The evidence also showed that LCV testing revealed blood on the door handle to defendant's car and the RBLS swabbed from the interior of defendant's car contained defendant's DNA. The jury could reasonably infer that, contrary to her statement to the police, defendant was already bleeding at the time that she left the house for her trip to Huck's, and not that she was injured by an intruder after she returned home.

¶ 70 We acknowledge that the two knives and the shower curtain recovered from the landfill were not directly tied to the scene or to defendant. Testimony at trial, however, indicated that these items were compacted in the landfill with contaminated soil and medical waste. It is reasonable to infer that the contamination of these objects precluded meaningful forensic testing of these items. That does not mean, as defendant maintains, that this evidence was irrelevant. These items had some probative value given that they were found in the landfill and in a location where it was believed the garbage truck would have deposited the trash collected from the Huck's where defendant was seen on video throwing items away.

¶ 71 Defendant also argues the evidence does not support the State's theory that defendant was physically capable of killing Jade and placing her body in the bath tub. Defendant's argument is based upon testimony that Jade was "a couple of inches taller" than defendant and that Jade "maybe

28

weighed a little bit more." Since no evidence was presented as to defendant's physical capabilities or limitations, this argument is based upon pure speculation.

¶ 72    Finally, defendant argues that her failure to tell the police that she stopped at Huck's was insignificant, especially given the stress and trauma she would have felt during her interview. Defendant goes so far as to suggest that her failure to mention this stop hurt her because her presence on the Huck's video "would have helped her substantiate her alibi." We disagree. A jury could reasonably conclude that defendant failed to mention her trip to Huck's because she knew that she disposed of evidence at the gas pumps, and that informing the police of her stop would have led to a timely search of the trash and the discovery of evidence of defendant's guilt.

¶ 73    Of significance when considering the weight of the evidence is defendant's statement to the police. "A defendant's false exculpatory statement may be admissible to establish the defendant's consciousness of guilt." *People v. McQueen*, 115 Ill. App. 3d 833, 837 (1983). Defendant told the police that she drove to Carbondale Walmart, going so far as to tell the police the route she drove to get there. Despite being asked if she stopped for gas, defendant denied any such stop. The evidence demonstrated that defendant did not make the nearly 30 minute drive to the Carbondale Walmart. Instead, the evidence showed that defendant drove to the Huck's convenience store six to seven minutes from her home, deposited something in the trash, and returned home at approximately 11:53 a.m., approximately 17 minutes after she left the house. Defendant told the police that, after a brief struggle with an armed intruder exiting the house, she went into the master bathroom, quickly washed the cuts on her hand, checked on Jade and called 911. Defendant's statement to the police did not explain the more than 30 minute delay between her return to the house and her 911 call.

29

¶ 74    A jury is not required to accept a defendant's version of what happened at the time of the crime. *People v. Lester*, 145 Ill. App. 3d 720, 738 (1986). Rather, a jury is allowed to "consider the surrounding circumstances and the probability or the improbability of the defendant's story." *Id.* Succinctly stated, "[w]hen the defendant elects to explain the circumstances [of an offense], [s]he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies." *Id.* A jury could easily find parts of defendant's statement to the police to be improbable, and as noted above, other parts were demonstrably false. The evidence presented at trial was not "so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt" of defendant's guilt. *Campbell*, 146 Ill. 2d at 375. Indeed, even when disregarding Dr. Wold's testimony regarding the bite mark, this court finds the evidence of defendant's guilt is overwhelming.

¶ 75    Finally, defendant argues that cumulative errors warrant a new trial. In addition to her claims regarding the bite mark testimony and the prosecutor's improper comment during rebuttal argument, defendant raises additional claims that the trial court erred in denying her motion for a mistrial based upon issues that arose with the jury prior to closing arguments. Defendant does not argue that these additional errors rise to the level of independently reversible error.

¶ 76    As noted above, a juror reported that she believed that a person associated with defendant recorded her in the parking lot. Based upon this information, and after consulting with the State, defense counsel and defendant herself, the court conducted *voir dire* of this juror. Before doing so, the court stated that it would ask the juror what happened and determine whether the occurrence impacted the juror's ability to be fair and impartial. The court also told the parties that it would ask whether this juror had "communicated her observation to any other jurors or to any other person" and that "[d]epending upon that answer, more things may need to be done." Also as noted

30

above, based upon the fact that the juror indicated that she had spoken with other jurors, the judge questioned three additional jurors.

¶ 77    Defendant now argues that the court conducted the *voir dire* of the additional jurors without prior notice or consultation. We disagree. It is readily apparent that the trial court considered that questioning of additional jurors may be necessary depending upon whether the first juror had discussed the matter with other jurors. Furthermore, after questioning the jurors, the judge informed counsel as to what he learned. Defense counsel asked for the opportunity to review the transcript of the *voir dire* prior to making any motion. After reviewing the transcript, defense counsel moved for a mistrial based upon "what occurred that is fully of record in chambers as to some of the issues that arose this morning with the jury. We believe at this point that the proceedings may actually be tainted." Defense counsel acknowledged that the court conducted *voir dire* "by agreement of all the parties and by [defendant]." Defense counsel did not raise an objection regarding the court interviewing the additional jurors at that time, although she raised it in the posttrial motion.

¶ 78    We fail to find error in the trial court's actions involving the supplemental *voir dire* of the jurors. Defendant agreed to the supplemental *voir dire* of the juror who reported her belief that the jury was being video recorded. As noted, the judge told the parties, "Another question would be whether she communicated her observation to any other juror or to any other person. Depending upon *that* answer, *more things may need to be done*." (Emphases added.) The parties, and defendant herself, agreed to this process. The record supports the conclusion that defendant was provided notice that additional jurors may need to be questioned, and defendant did not object at that time or after reviewing the transcript of the court's interactions with those jurors.

31

¶ 79    Defendant's posttrial motion raised additional issues with two of the jurors, Jurors 4 and 11. Juror 4 was one of the jurors questioned by the trial court regarding the video recording inquiry. During his supplemental *voir dire*, he disclosed that he knew "some of the people in that family." Defendant did not argue this issue when she moved for a mistrial but only raised it in her posttrial motion. Defendant also argues that during jury selection, Juror 4 failed to disclose that he knew members of the victim's family and that he further failed to disclose that he has a relative working in law enforcement. Finally, regarding Juror 11, defendant argues that she failed to disclose, during jury selection, that she knew one of the witnesses.

¶ 80    We first address defendant's argument regarding her claim that Juror 4 failed to disclose that he knew a member of the victim's family. We find that defendant forfeited this argument. "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Defense counsel had the transcript of Juror 4's supplemental *voir dire* with the judge but failed to raise this as an issue at the time that she learned this information. Forfeiture notwithstanding, we note that defendant's argument is premised upon the assumption that Juror 4 was referring to Jade's family. Reviewing the record, this court cannot conclude that Juror 4 referred to either the victim's family or defendant's family. Taken in context, it is entirely possible that Juror 4 could have been speaking about the family of the woman who was believed to be video recording the jurors, a friend of the defendant.

¶ 81    We next consider defendant's claim that Juror 4 failed to disclose that he had a cousin who worked at the Williamson County Jail and Juror 11 failed to disclose that she was Facebook friends with a potential witness. "Both the United States and Illinois Constitutions guarantee an accused a jury that is impartial [citations], which means a jury capable and willing to decide the case solely

32

on the evidence before it." (Internal quotation marks omitted.) *People v. Olinger*, 176 Ill. 2d 326, 353 (1997).

¶ 82 During the hearing on defendant's posttrial motion, the State noted that there was no evidence that Juror 4 had a relative who worked at the jail, the nature of the relationship between Juror 4 and the relative, or if they have spoken with each other in the last 20 years. Defense counsel stated that the individual was a correctional officer at the jail. We note that there is no affidavit or any evidence in support of defendant's contention. Thus, the record is unclear as to whether Juror 4 in fact has a relative employed at the county jail, and if so, the nature of their relationship. Regarding Juror 11 failure to disclose being Facebook friends with a potential witness, we note that the court never indicated which side may be calling which witness, and we further note that Marks did not testify at trial. During jury selection, both Juror 4 and Juror 11 stated that they would be fair and impartial in rendering a verdict and that they would decide the case only on the facts, evidence and the law presented in court. Based upon the record before this court, we cannot find defendant has submitted evidence to suggest that she was deprived of a fair and impartial jury.

¶ 83 Accordingly, having found no error regarding the bite mark testimony, the prosecutor's comment in rebuttal, or with regard to the jury, there can be no cumulative error. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 60. For these reasons, we reject defendant's claim of cumulative error and affirm defendant's conviction.

¶ 84                                    III. CONCLUSION

¶ 85 For the foregoing reasons, the judgment of the Williamson County Circuit Court is affirmed.


¶ 86 Affirmed.